**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| IN THE MATTER OF | ) | Chapter 11 |
| | ) | |
| KAUKAUNA LODGING, INC., *et al.*, | ) | Case No. BK 10-82869 |
| | ) | (Lead Case) |
| Debtors. | ) | |

---

**TRIAL BRIEF OF U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE,
SUCCESSOR-IN-INTEREST TO BANK OF AMERICA, N.A., AS TRUSTEE,
SUCCESSOR TO WELLS FARGO BANK, N.A., AS TRUSTEE, FOR THE
REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL
MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2005-C22 IN SUPPORT OF ITS MOTION
FOR RELIEF FROM THE AUTOMATIC STAY**

U.S. Bank National Association, as Trustee, Successor-in-Interest to Bank of America,

N.A., as Trustee, Successor to Wells Fargo Bank, N.A., as Trustee, for the Registered Holders of

Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates,

Series 2005-C22 ("Lender"), by its undersigned counsel, hereby presents its trial brief in support

of its motion for relief from the automatic stay and, in support thereof, states as follows:

## I.  INTRODUCTION

On October 1, 2010 (the "Petition Date"), the Debtors[1] commenced these cases under

Chapter 11 of the Bankruptcy Code.  The Debtors each own a hotel (the "Hotels") located in the

Midwest, which independently secure a $7,155,000 loan (the "Loan").  Lender made the Loan to

the Debtors and obtained separate deeds of trust and/or mortgages and separate assignments of

rents in each Hotel.  Lender has a valid and perfected first priority security interest in, *inter alia*,

the cash proceeds of, and the rents and revenues generated by the Hotels, which constitute

---

[1] Kaukauna Lodging, Inc., Grand Forks Settle Inn Limited Partnership, Grand Forks Lodging Limited
Partnership, Seward Lodging Builders, Inc. and Lincoln Ventures, L.L.C. are hereinafter described as the
"Debtors."

Lender's cash collateral. Lender is the Debtors' sole secured creditor and the indebtedness due under the Loan constitutes the vast majority of the Debtors' outstanding debt. Most of the Debtors owe non-insider unsecured creditors *de minimus* amounts.

The Debtors defaulted on the Loan in December 2009, causing Lender to file foreclosure actions against the Hotels. During the Debtors' pre-petition default period, Lender attempted to negotiate a modification of the Loan, but the Debtors' offer was unacceptable to Lender, primarily because the Debtors' equity holders refused to infuse sufficient new capital.

On June 15, 2011, nine months after filing for bankruptcy and on the date of the Court's deadline for filing plans, the Debtors filed a plan long on boilerplate and short on specifics of exactly how the plan could be confirmed. Remarkably, the Debtors' proposal to Lender worsened from what it was before bankruptcy, as the Debtors no longer proposed to infuse *any* new capital while allowing existing equity holders to retain their interests and be forgiven substantial debts that they owed to the Debtors. Due to the considerable deficiencies in the Debtors' disclosure statement, the Court ordered the Debtors to file an amended disclosure statement addressing Lender's concerns. On August 22, 2011, the Debtors filed an amended disclosure statement and an amended plan of reorganization. Unfortunately, the amended disclosure statement failed to address all of Lender's issues, including some of the most major ones. However, the Court need not determine the adequacy of the Amended Disclosure Statement because the Debtors admit that they have no equity in the Hotels and, for the reasons set forth below, they are unable to meet their burden of proving that their amended plan of reorganization is confirmable.

2

## II.    ARGUMENT

**A.    The Applicable Legal Standard For Relief From The Automatic Stay**

Section 362(d) of the Bankruptcy Code provides in pertinent part as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if –
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(1) and (2).  Subsections (d)(1) and (d)(2) are disjunctive and provide

alternative means of obtaining stay relief.  *See Prod. Credit Assoc. of the Midland v. Wieseler (In*

*re Wieseler)*, 934 F.2d 965, 968 (8th Cir. 1991).  Thus, if the movant satisfies either subsection

362(d)(1) or 362(d)(2), the court *must* grant relief from the automatic stay. *See In re Elmira*

*Litho, Inc.*, 174 B.R. 892, 900 (Bankr. S.D.N.Y. 1994).

At a hearing on a creditor's motion for relief from the automatic stay, the creditor "has

the burden on the issue of the debtor's equity in property" and "the party opposing the relief has

the burden on all other issues."  11 U.S.C. § 362(g); *United Sav. Ass'n of Texas v. Timbers of*

*Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988) ("Once the movant under § 362(d)(2)

establishes that he is an undersecured creditor, it is the burden of the debtor to establish that the

collateral at issue is 'necessary to an effective reorganization.' See § 362(g)."); *Anderson v.*

*Farm Credit Bank of St. Paul (In re Anderson)*, 913 F.2d 530, 532 (8th Cir. 1990) ("It is

undisputed that the Andersons have no equity in the secured property and that the bank has met

its burden of proof on this issue. The burden thus shifted to the Andersons to establish that the

property was necessary to an effective reorganization."); *Bowman v. Bond (In re Bowman)*, 253

3

B.R. 233, 237 (B.A.P. 8th Cir. 2000) ("the creditor seeking relief from the automatic stay

initially bears the burden of showing that the debtor has no equity in the secured property. . . .

Once the creditor sustains that burden, the burden of proof then shifts to the debtor to show that

the property is necessary to an effective reorganization."); *In re Mueller*, 123 B.R. 613, 615

(Bankr. D. Neb. 1990) ("The plaintiff has the burden of proof on the issue of debtor's equity in

the property, and the debtor has the burden of proof on all other issues."); *In re McMartin Indus.,*

*Inc.*, 62 B.R. 718, 722 (Bankr. D. Neb. 1986) ("On motion for relief from automatic stay

pursuant to § 362(d)(1) and (2), the moving party has the burden of proof on the issue of the

debtor's equity in the property and the debtor has the burden of proof on all other issues,

including the issue of whether or not the property is necessary to an effective reorganization,

whether the secured party's interest in the collateral is adequately protected and for showing that

there is no cause for relief. See § 362(g).").

## B.    The Debtors Lack Equity In Their Hotels

The Debtors do not have any equity in their Hotels as the Court has found that "it is

undisputed that Lender is under secured." *See* August 9, 2011 Order at Dkt. No. 146. Lender's

secured proof of claim filed against each of the Debtors totals $7,948,400.95. Lender's claim is

*prima facie* valid. *See* Fed. R. Bank. P. 3001(f); *see also Fed. Deposit Ins. Corp. v. Union*

*Entities (In re Be-Mac Transp. Co., Inc.)*, 83 F.3d 1020, 1025 (8th Cir. 1996) ("Once a proof of

claim is filed, the claim is deemed allowed and the proof constitutes prima facie evidence of the

claim's validity and amount"). In contrast, Lender's March 2011 Appraisals, which the Debtors

have accepted, value the five Hotels combined at only $7,465,000. *See* Kaukauna Lodging, Inc.

Appraisal ($1,040,000); Grand Forks Settle Inn Limited Partnership Appraisal ($1,250,000);

Grand Forks Lodging Limited Partnership Appraisal ($1,825,000); Seward Lodging Builders,

Inc. Appraisal ($1,100,000); Lincoln Ventures, L.L.C. Appraisal ($2,250,000). Because each of

the Debtors are individually liable for the full amount of the Loan, which is secured by each of

the Hotels, the Debtors do not have any equity in their Hotels. *See* 11 U.S.C. § 362(d)(2)(A).

**C.    The Debtors' Amended Plan Is Not Confirmable**

In *United Saving Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484

U.S. 365, 376-77 (1988), the United States Supreme Court set forth the test that a debtor must

satisfy to meet its burden of proving that its property is necessary for an effective reorganization:

> Once the movant under § 362(d)(2) establishes that he is an undersecured
> creditor, it is the burden of the debtor to establish that the collateral at
> issue is "necessary to an effective reorganization." See § 362(g). What this
> requires is not merely a showing that if there is conceivably to be an
> effective reorganization, this property will be needed for it; but that the
> property is essential for an effective reorganization that is in prospect. This
> means, as many lower courts, including the en banc court in this case,
> have properly said, that there must be "a reasonable possibility of a
> successful reorganization within a reasonable time."

"If no reorganization of the debtor is feasible, then no property of that debtor can be necessary

for that end." *Ahlers v. Norwest Bank Worthington (In re Ahlers)*, 794 F.2d 388, 397-98 (8th

Cir. 1986) (reversed on other grounds); *see also Bowman*, 253 B.R. at 238 ("The Supreme Court

held that the debtor must show there is a 'reasonable possibility of a successful reorganization

within a reasonable time' to satisfy section 362(d)(2)'s 'necessary for an effective

reorganization' component. More specifically, a debtor must show that its proposed plan of

reorganization is feasible and therefore, likely confirmable.") (citation omitted); *In re Belton

Inns, Inc.*, 71 B.R. 811, 817 (Bankr. S.D. Iowa 1987) ("The Eighth Circuit recently adopted other

court interpretations of the 'necessary for an effective reorganization' standard as requiring a

debtor not only to show that the property is essential to reorganization but to demonstrate that an

effective reorganization is realistically possible.").

"A bare assertion by the debtor that the property is necessary for survival and

reorganization does not satisfy the standard." *Belton*, 71 B.R. at 817. It is insufficient if the

5

debtor can only offer a hope of finding a purchaser or lender. *See In re Kaplan Breslaw Ash,*

*LLC*, 264 B.R. 309, 319 (Bankr. S.D.N.Y. 2001); *see also In re Boca Dev. Assocs.*, 21 B.R. 624,

630 (Bankr. S.D.N.Y. 1982). As one court opined:

> the "effective reorganization" standard must be given meaning . . . Thus,
> "the debtor must do more than evince high hopes" . . . A "mere financial
> pipe dream" is insufficient to meet the requirements of § 362(d)(2) . . . In
> the same fashion, sincerity, honesty, willingness, and visionary promises
> will not support a conclusion that there is reasonable possibility of a
> successful reorganization.   Instead, "[t]he automatic stay will remain
> operative . . . only if the debtor can demonstrate that its prospects of an
> effective reorganization are well founded . . . Consequently, a debtor must
> do more than merely assert that it can reorganize if only given the
> opportunity to do so. These assertions must have some foundation 'based
> upon objective fact."

*Am. State Bank v. Grand Sports, Inc. (In re Grand Sports, Inc.)*, 86 B.R. 971, 975 (Bankr. N.D.

Ind. 1988) (citations omitted). Moreover, the threshold that a debtor must satisfy to defeat a

motion for relief from the automatic stay increases with the duration of the case. *See, e.g.,*

*Edgewater Walk Apartments v. MONY Life Ins. Co. of Am.*, 162 B.R. 490, 500-01 (N.D. Ill.

1993); *In re Ashgrove Apartments of DeKalb County, Ltd.*, 121 B.R. 752, 757 (Bankr. S.D. Ohio

1990).

  The Court should grant Lender relief from the automatic stay because the Debtors have

failed to file confirmable plans of reorganization after 11 months in bankruptcy. The Court

should allow Lender to "staunch the flow of blood and minimize its losses." *Enodis Corp. v.*

*Wausau Ins. Co. (In re Consol. Indus. Corp.)*, 330 B.R. 227, 233 (Bankr. N.D. Ind. 2001). The

obstacles facing the Debtors, including the lack of *any* monetary contributions from existing

equity, the lack of any third-party financing, the financial instability of the franchisor (Settle Inn,

L.L.C. ("Settle Inn")) for several of the Debtors and the Debtors' lack of any equity in their

Hotels, make it highly unlikely that the Debtors will be able to reorganize. While the Debtors'

burden to demonstrate that they can successfully reorganize has markedly increased with the

6

passage of almost a year in bankruptcy, the Debtors' reorganization prospects have decreased as their Amended Plan is patently non-confirmable.

    *1.    The Terms Of The Debtors' Amended Plan*

The Debtors' Amended Plan consists of four classes of claims:

> Class One – Lender's secured claim
> Class Two – Lender's unsecured claim
> Class Three – General unsecured claims
> Class Four – Equity interests

The Debtors propose to impair Classes One and Three and pay in full all allowed administrative expenses, priority tax claims and other priority claims. *See* Am. Disclosure Statement, Ex. C at § 3.1.2. The Amended Plan proposes to pay Lender's Class Two unsecured claim in full at the effective date from Lender's own cash collateral, rendering Lender's Class Two Claim unimpaired. *See id.* at § 5.2. The Amended Plan provides for monthly payments to Lender on its Class One claim on a 30-year amortization schedule with interest accruing at the lesser of 6% or the national prime rate plus 2% (currently equivalent to 5.25%), to be payable until December, 2015 when the claim would mature and somehow be paid. The Amended Plan also proposes to pay a fee from Lender's cash collateral to Lender's agent, CWCapital Asset Management LLC, equal to one percent of Lender's Class One Claim. Class Three claims will be paid over the course of one year and will not accrue interest, rendering them impaired. Class Four equity holders will retain their equity interests in the Debtors without having to contribute any new money.

    Lender's $7,948,400.95 claim against each of the Debtors will be divided into secured and unsecured portions because the amount is higher than the appraised value of the Debtors' assets. 11 U.S.C. § 506(a)(1); *Assocs. Comm. Corp. v. Rash*, 520 U.S. 953, 961 (1997) (where a

7

secured creditor's collateral is undersecured, its claim "is to be divided into secured and

unsecured portions, with the secured portion of the claim limited to the value of the collateral.").

Lender's March 2011 appraisals, which the Debtors have accepted, valued the Hotels at

$7,465,000, which together with the Debtors' $415,001.83 in cash on hand on the Petition Date

totals $7,880,001.83. Therefore, Lender's Class One claim is $7,880,001.83 and its Class Two

claim is $68,399.12. By Lender's calculation, the total of all other non-insider general unsecured

claims owed by the Debtors is just $62,942.42. David Graf ("Graf"), the majority owner of the

Debtors, has agreed with Lender's calculation.[2] Thus, Lender's unsecured claim amounts to

52% of the Debtors' general unsecured claims.

As is readily apparent from its terms, the Amended Plan is patently unconfirmable

because: (1) it improperly gerrymanders an accepting impaired class; (2) the Debtors did not

propose it in good faith; (3) it is not feasible; (4) Graf's continued control of the Debtors is not in

the best interests of their creditors; (5) the Debtors have impermissibly created an artificially

impaired class in order to cram down Lender, which will vote to reject the Amended Plan; (6) it

impermissibly seeks to use Lender's cash collateral to make plan payments, including paying the

Debtors' administrative expenses and Lender's Class Two unsecured deficiency claim; and (7) it

proposes an impermissible substantive consolidation of the Debtors' estates.

2.     *The Amended Plan Does Not Comply With The Bankruptcy Code*

Sections 1129(a)(1) and (10) of the Bankruptcy Code provide that "a court shall confirm

a plan only if all of the following requirements are met . . . If a class of claims is impaired under

---

[2] In Case No. 10-82870 (*In re Omaha Settle Inn Limited Partnership*), Lender calculates that the total
non-insider general unsecured claims owed by the debtors in that case is $19,356.35. Graf has stated that,
together with the debtors in Case No. 10-82870, the Debtors owe approximately $82,000 in non-insider
general unsecured creditors. *See* Transcript of August 29, 2011 deposition of David Graf (the "August
Graf Transcript") at p. 21 lines 11 – 25.

the plan, at least one class of claims that is impaired under the plan has accepted the plan,

determined without including any acceptance of the plan by any insider." *See also Heidelberg*

*Print Fin. Ams., Inc. v. Master Servs., Inc.*, 188 Fed. App'x 534, 536 (8th Cir. 2006) ("Under

section 1129(a), confirmation of a plan is permissible if at least one impaired class has accepted

the plan, without insider voting or artificial creation of the impaired class accepting the plan.").

In formulating a plan, a debtor cannot arbitrarily segregate similar types of claims in order to

obtain compliance with Section 1129(a)(10).  Under Section 1122(a) of the Bankruptcy Code, "a

plan may place a claim or an interest in a particular class only if such claim or interest is

substantially similar to the other claims or interests of such class."  "Proper classification is

essential to ensure that creditors with claims of similar priority against the debtor's assets are

treated similarly." *In re Hillside Park Apartments, L.P.*, 205 B.R. 177, 183 (Bank. W.D. Mo.

1997).  "Classification of claims thus affects the integrity of the voting process, for, if claims

could be arbitrarily placed in separate classes, it would almost always be possible for the debtor

to manipulate 'acceptance' by artful classification." *Id.* at 183-84.  "[T]here is one clear rule on

section 1122(a) claims classification: 'thou shalt not classify similar claims differently in order to

gerrymander an affirmative vote on a reorganization plan.'" *Id.* at 186 (quoting *Phoenix Mut.*

*Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274,

1279 (5th Cir. 1991)).

The Debtors improperly impair and classify all non-Lender general unsecured claims

separately as Class Three while Lender's unsecured claim is individually classified as Class

Two.  The Debtors propose to pay Lender's Class Two unsecured claim of $68,000 in full on the

effective date, yet the Debtors separately classify the $63,000 of general unsecured claims and

propose to pay them over one year.  It is obvious that the Class Three claims are artificially

impaired. Not only is such separate classification improper under the Bankruptcy Code, but also

more practically, if the Debtors have sufficient cash to pay Lender $68,000 on the effective date,

they clearly have sufficient cash to pay the $63,000 of unsecured claims. Moreover, Graf

admitted that he had no idea why Lender's deficiency claim was treated differently than general

unsecured claims.[3]

"Artificial classification of claims in order to achieve literal compliance with section

1129(a)(10) is improper under the code." *Windsor on the River Assocs., Ltd. v. Balcor Real*

*Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 131 (8th Cir. 1993)

("Since Chapter 11 is designed to promote consensual reorganization plans, a proposal that has

no support from impaired creditors cannot serve its purpose. It would be odd if an amendment

designed to give secured creditors more protection were used as the means to rewrite their credit

agreements without their consent. Confirmation of a plan where the debtor engineers the

impairment of the only approving impaired class 'so distorts the meaning and purpose of section

1129(a)(10) that to permit it would reduce (a)(10) to a nullity.'") (citations omitted).

Importantly, the Eighth Circuit has recognized that a debtor violates Section 1129(a)(10)

when it "attempt[s] to gain confirmation of its Chapter 11 reorganization plan over the objections

of its undersecured mortgage lender . . . [by] classif[ying] the unsecured portion of the lender's

claim separately from the unsecured trade claims . . . the only purpose to be served by such

facially improper classification [being] to ensure that at least one impaired class of claims would

approve the plan." *Id.* (citing *Lumber Exch. Bldg. Ltd. P'Ship v. Mut. Life Ins. Co. of New York*

*(In re Lumber Exch. Bldg. Ltd. P'Ship)*, 968 F.2d 647, 650 (8th Cir. 1992)); *see also Hanson v.*

*First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (9th Cir. 1987) (holding that "the

interests of trade creditors are not sufficiently unique to warrant separate classification" and that

---

[3] *See* Aug. Graf Tr. at p. 46 lines 16 – 20.

10

"[c]lassifications designed to manipulate class voting must be carefully scrutinized [because] [t]here is potential for abuse when the debtor has the power to classify creditors in a manner to assure that at least one class of impaired creditors will vote for the plan, thereby making it eligible for the cram down provisions."). Because Class Three claims are artificially impaired, they cannot be permitted to serve as the Debtors' sole accepting impaired class.

Moreover, the Debtors unfairly discriminate with respect to the separate treatment of general unsecured claims and Lender's deficiency claim. Courts look at several factors to determine whether discrimination of unsecured claims is unfair to creditors: (a) whether the discrimination has a reasonable basis; (b) whether the debtor can carry out a plan without the discrimination; (c) whether the discrimination is proposed in good faith; and (d) whether the degree of discrimination is directly related to the basis or rationale for the discrimination. *In re Kizzire*, No. BK08–80179–TLS, 2009 WL 2513436, at *1 (Bankr. D. Neb. Aug. 11, 2009) (J. Saladino). The Debtors' discrimination between their general unsecured claims and Lender's deficiency claim is unreasonable and not proposed in good faith.

Because the Debtor must classify Class Three claims with Lender's Class Two claims, there will be no accepting impaired class of unsecured creditors because either these claims will be paid in full on the effective date, rendering them unimpaired, or they will be paid something less than that and Lender will control the class vote in rejecting the Amended Plan. *See* 11 U.S.C. §1126(c). The only other potentially impaired parties in these cases, Crown Group, Inc. ("Crown"), Settle Inn and the various Debtors' equity holders, are insiders of the Debtors whose acceptance of the Amended Plan would not satisfy the requirements of Section 1129(a)(10). *See Heidelberg Print*, 188 Fed. App'x at 536. Thus, the Debtors are incapable of proposing a confirmable plan.

11

3.     *The Amended Plan Was Not Proposed In Good Faith*

A debtor must propose its plan in good faith. 11 U.S.C. § 1129(a)(3). Whether a plan is proposed in good faith turns on an examination of the totality of the circumstances surrounding the plan and the bankruptcy filing. *See Barger v. Hayes County Non-stock Co-op (In re Barger)*, 233 B.R. 80, 83 (B.A.P. 8th Cir. 1999). In the context of a chapter 11 reorganization, a plan is considered to have been proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code. *Id*. Pre-filing conduct is not determinative, but is nonetheless relevant. *Id.* at 84. In essence, the good faith inquiry looks at the debtor's fairness in dealing with creditors. A plan is filed in bad faith where it is not feasible or does not have a reasonable chance of success. *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'Ship (In re T-H New Orleans Ltd. P'Ship)*, 116 F.3d 790, 802 (5th Cir. 1997); *In re Rusty Jones, Inc.*, 110 B.R. 362, 375 (Bankr. N.D. Ill. 1990). A plan that benefits a debtor's insiders at the expense of its creditors is considered to have been filed in bad faith and is unconfirmable. *Rusty Jones*, 110 B.R. at 375 ("In determining whether a plan of reorganization has been proposed in good faith . . . the central inquiry is whether the plan will fairly achieve a result consistent with the objectives and purposes of the Code. . . . The instant proposed Plan does not serve that purpose . . . the Plan serves to an unacceptable extent as a vehicle for the personal profit of 'investors' who . . . sought to operate it in bankruptcy for their personal benefit and contrary to the interests of creditors.").

The Amended Plan evidences bad faith because it benefits the Debtors' equity holders at the expense of the Debtors' creditors. The Debtors propose to allow their current equity holders to retain their full equity interests in the Debtors while not requiring their owners to provide *any*

12

new value. Graf reiterated this intent at his recent deposition.[4] The Debtors also propose to

forgive their equity holders' sizeable debts to them, namely $2,249,361.35[5] in loans that the

Debtors made to their equity holders and other insiders. *See* Am. Disclosure Statement at Ex. D.

Graf also reiterated this intent at his recent deposition.[6] The Debtors allege that none of these

loans are collectible, but they have failed to demonstrate why not. Many of these loans were

made directly to the Debtors' equity holders and appear on the Debtors' general ledgers. How

these amounts can be uncollectible when the equity holders are being allowed to retain their

ownership interests in the Debtors – an asset – remains a mystery and demonstrates the Amended

Plan's lack of good faith.

4.     *The Amended Plan Is Not Feasible*

A plan must be feasible and not likely to lead to the liquidation or further financial

reorganization of a debtor. 11 U.S.C. § 1129(a)(11); *see also In re Ahlers*, 794 F.2d at 397-98.

To be feasible, a debtor must be able to make the payments called for in its plan. Courts

generally consider a number of factors in determining the feasibility of a plan, such as: (a) the

reorganized debtor's earning power; (b) the adequacy of the reorganized debtor's capital

structure; (c) current and projected economic conditions; (d) the capability of proposed

management; (e) the probability of continuation of the same management; and (f) any other

related matters that determine the prospects of a sufficiently successful operation to enable

performance of the plan, such as the liquidity of the reorganized debtor and its ability to meet

---

[4] *See* Aug. Graf Tr. at p. 8 lines 6 – 19.

[5] The Debtors' Schedules of Assets and Liabilities (the "Schedules") disclose $2,249,361.35 in loans to their insiders, but Exhibit E to their Amended Disclosure Statement reveals only $2,208,280.81 in loans to their insiders.

[6] *See* Aug. Graf Tr. at pp. 26:25 – 27:10.

current debts. *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 589 (6th Cir. 1986); *In re Apex Oil Co.*, 118 B.R. 683, 708 (Bankr. E.D. Mo. 1990); *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D. N.D. 1985).

To sustain their burden of proof that their Amended Plan is feasible, the Debtors have provided more than 300 pages of line-item detail that consists of their projected net income through 2015 and 23 pages of marketing "fluff." *See* Am. Disclosure Statement at Exs. A-B. While the Debtors provided detail as to the line items comprising their projected net operating income, their projections are utterly deficient as they fail to reflect *any* of their required payments under the Amended Plan. Remarkably, even after Lender objected to such non-disclosure, Graf and Wayne Heintz ("Heintz"), the President of the Crown, the Debtors' management company, admitted at their recent depositions that they still have not prepared an analysis showing the payments that will be required under the Debtors' Amended Plan or how those payments will be made.[7] Moreover, the Debtors failed to include required capital reserve payments and Class One debt service plan payments in their "NOI" projections and they failed to provide a summary of their net operating income reflecting such payments.[8] Instead, the Debtors present misleadingly optimistic NOI figures for 2012 – 2015 of "$795,000.00, $900,000.00, $995,000.00, and $1,054,121.00." *See* Am. Disclosure Statement at § III(G). While the Debtors do provide a slightly more realistic NOI figure in their "Net Profit/(Loss)" line item, this line item consists solely of the Debtors' NOI projections minus their current cash collateral interest payments to Lender, making those projections useless for determining the Debtors' post-

---

[7] *See* Aug. Graf Tr. at p. 16 lines 19 – 24; *see also* Transcript of August 29, 2011 deposition of Wayne Heintz (the "Heintz Transcript") at p. 15 lines 2 – 9.

[8] *See* Heintz Tr. at p. 17 lines 3 – 10; p. 22 lines 9 – 15; p. 55 lines 20 – 22; Aug. Graf Tr. pp. 44:25 – 45:8.

confirmation performance, as their debt service will be substantially higher.

The Debtors also fail to show how they will make all of their required payments under the Amended Plan such as: (i) the Class Two payments; (ii) the Class Three payments; (iii) their assumption and/or rejection costs for their executory contracts; (iv) their modification fee payable to Lender's servicer; (v) their funding of existing necessary capital improvements at the Hotels; and (vi) their funding of all of the capital expenditure reserve payments that they have failed to make for the past two years. The lack of meaningful financial data and projections in the Amended Disclosure Statement does not permit the Court or creditors to determine whether the Amended Plan is feasible. In fact, based on Lender's analysis, as provided in Exhibit 1 hereto, the Amended Plan is clearly *not* feasible.

Exhibit 1 shows:

a.   The Debtors' projected "net operating income" from Exhibit B to their Amended Disclosure Statement;

b.   Required capital expenditure reserve payments equal to 4% of the Debtors' projected revenue as provided in Exhibit B to their Amended Disclosure Statement, the amount expected under the Loan Documents. Graf and Heintz admitted that this is the proper amount of capital expenditure reserve payments for the Debtors to make during the plan period and they also admit that they failed to include these payments in their Amended Disclosure Statement[9]; and

c.   An interest rate and amortization period of 7% and 20 years, respectively, on Lender's Class One claim, as discussed in more detail below.

As indicated in Exhibit 1 hereto, the Hotels would operate at a loss during their crucial first year post-confirmation and make small profits for the rest of their four-year plan period, providing them inadequate cash flow to meet their substantial negative cash flow during the November to April slow season.

---

[9] *See* Aug. Graf Tr. at p. 14 lines 19 – 24; Heintz Tr. at p. 22 lines 16 – 21.

60642-0255/LEGAL21603470.4

Moreover, the Debtors grossly underestimate their operating expenses in their
projections.  For instance, the Debtors unreasonably project that their yearly expenses for real
estate taxes and insurance will remain static at their 2011 levels for the next four years through
2015, that their expenses for telephone/energy/utilities will decrease from their 2011 levels
through 2015 and that their expenses for telephone and utilities and television will remain static
from 2013 to 2015.  *See* Summary Budgets in Am. Disclosure Statement, Ex. B.  Graf and
Heintz admitted that utility expenses increase with occupancy and Heintz also admitted that the
Debtors' financial projections were "incorrect" because the projections failed to show a yearly
increase in insurance and real estate taxes during the plan period.[10]  Any reasonable financial
projections would show an increase in these expenses over time – at least at the rate of inflation –
especially given that the Debtors project a 9.9% increase in their occupancy levels.  It is simply
not credible that certain expenses like utilities would remain the same as more people would be
staying at the Hotels and using the utilities.  *See id.*  Indeed, Lender believes that the Debtors
have underestimated their expenses by at least 25%.

As for the use of cash on hand on the confirmation date, it is apparent why the Debtors
failed to show necessary plan payments – they lack adequate cash.  Attached as Exhibit 2 is a
chart prepared by Lender showing the use of the Debtors' expected cash on hand in the first year
of their Amended Plan and required Amended Plan payments, which include:

a.    The Debtors' cash on hand as of July 31, 2011, as provided in their July
       2011 operating reports, as well as their projected net income for August
       2011 through December 2011;

b.    The 1% modification fee payable to Lender's servicer, CWCapital Asset
       Management LLC.  *See* Am. Disclosure Statement at Ex. C, § 5.1.4;

---

[10] *See* Heintz Tr. at p. 48 lines 7 – 11; p. 49 lines 16 – 23; pp. 54:22 – 55:3; Aug. Graf Tr. at p. 30 lines
5 – 7.

16

c.      Payment of all general unsecured Class Three claims;

d.      Payment of the cure costs for assumption of the Settle Inn and Best Western International, Inc. ("Best Western") franchise agreements (it appears that the Debtors intend to assume all of their franchise agreements, although the Debtors have not specifically stated whether they will do so);

e.      Payment of Lender's unsecured Class Two claim on the effective date. *See id.* at § 5.2;

f.      Funding for the existing, necessary capital improvements at the Hotels. *See* transcript of the February 23, 2011 deposition of David Graf (the "February Graf Transcript") at pp. 55:11 – 59:21; Aug. Graf Tr. at p. 10 lines 10 – 24. Graf and Heintz admitted that the Debtors have not performed any capital improvements at the Hotels during the bankruptcies. *See* Aug. Graf. Tr. p. 5 lines 12 – 15, pp. 37:20 – 1:2; Heintz Tr. at p. 27 lines 4 – 9.

g.      Capital expenditure reserve payments from the date of the Debtors' last such payment, November 2009, through the Debtors' expected effective date of January 1, 2012 pursuant to Sections 3.6 – 3.10 of the Debtors' Loan Agreement with Lender[11]; and

h.      Payment of the Debtors' attorneys' fees. *See* Am. Disclosure Statement at § 5(G); Ex. C, § 4.1.

Based solely on the Amended Plan payments provided in Exhibit 2, at the end of their first year of the Debtors' plan period, they will have exhausted all of their cash on hand *and lost an additional $390,*000. The Amended Plan also fails to provide for the Debtors' retention of sufficient cash to allow them to survive the upcoming winter season. The Debtors operate seasonal businesses that generate the majority of their cash during the summer months and operate at a substantial loss during the winter months.[12] For example, from the Petition Date of October 1, 2010 through April 30, 2011, the Debtors lost $83,413.18 during a time period in

---

[11] Graf admitted that the Debtors have not made capital expenditure reserve payments since November 2009. *See* Aug. Graf Tr. at pp. 15:9 – 20.

[12] *See* Heintz Tr. at pp. 33:21 – 34:8.

60642-0255/LEGAL21603470.4

which they did not make principal payments to Lender, did not make any capital expenditure reserve payments and paid interest to Lender at a lower rate and on a smaller debt service amount than will be required under a plan. A chart showing the Debtors' loss of cash over the most recent winter season is attached hereto as Exhibit 3.

Further, the Debtors have not provided any evidence that their current management, Crown, and their current ownership, primarily Graf, are capable of successfully operating the Hotels. Crown and Graf oversaw the Hotels' decline in profitability and entrance into bankruptcy. Despite their dubious record, the Debtors propose to retain Crown as manager post-confirmation and to retain their current ownership structure. The Debtors provide no explanation as to why Crown has the competency and is the appropriate party to manage the Hotels. The marketing materials provided in the Amended Disclosure Statement inspire little confidence in Crown's ability to manage the Hotels successfully as they contain little more than: (a) general descriptions of prior-performed renovations and the Hotels' prior performance; (b) a reference to an unexplained "Re-Launch" to be performed within 30 days of plan confirmation; (c) confirmation that the Hotels will continue to be operated with nearly the same failed approach as they were pre-petition and during the bankruptcy cases; (d) general descriptions of proposed marketing initiatives; and (e) vague assertions as to how the Debtors plan to improve their operations.[13] The Debtors have apparently failed to consult with any outside hotel management professionals on how to reorganize their businesses for better performance.

Moreover, the affiliation of two of the Debtors' five Hotels with Settle Inn is in jeopardy

---

[13] A representative example of this is found on the first page of Exhibit A to the Amended Disclosure Statement: "As a group we have developed Objectives, Action Plans and Strategic Initiatives to accomplish our goals. Our Objectives have been clear and Actions [sic] Plans are sound, but in some cases the results were not achieved. We have everything in place and now is the time to take action and produce the desired results. Success will be measured by our ability to increase revenues and receive our fair share in the marketplace. Our focus is on the RESULTS!"

because of Settle Inn's precarious financial condition.[14] It is undisputed that Settle Inn – which

only has 15 hotels in their entire chain – is experiencing financial difficulties. If its business

fails, which Settle Inn has alleged may be imminent, the four Debtors will lose their access to a

computer-based reservation system without having in place a replacement franchise affiliation

because the Debtors have not established a contingency plan in the event that they lose the Settle

Inn franchise. The abrupt loss of the Settle Inn franchise affiliation would cause a precipitous

decline in the value of the Settle Inn affiliated Hotels, thereby jeopardizing the success of the

Amended Plan. In keeping with the Debtors' refusal to change the management of the Hotels,

the Debtors have not even considered re-branding their Hotels.[15] This is not surprising

considering the many ties among Graf, Settle Inn and Crown.[16]

The Amended Plan additionally fails to provide for the payment of cure costs on the

executory contracts that the Debtors plan to assume. While the Amended Plan does not discuss

which executory contracts the Debtors propose to assume, it appears that the Debtors expect to

maintain their current franchise affiliations, despite providing no analysis as to why the Hotels'

---

[14] *See* Settle Inn's February 15, 2011 Motion to Force Debtors to Assume or Reject Contracts and
Request for Expedited Resistance Deadline Assumption at ¶ 7; *see also* transcript of the February 23,
2011 deposition of Deborah Twiss (the "Twiss Transcript") at pp. 32:17 – 33:7.

[15] *See* Feb. Graf Tr. at p. 49 lines 18 – 21; Twiss Tr. at p. 20 lines 21 – 24.

[16] Graf directly owns 50% of Grand Forks Settle Inn Limited Partnership, 50% of Seward Lodging
Builders, Inc., 32% of Kaukauna Lodging, Inc. and 10.2% of Grand Forks Lodging Limited Partnership.
His family members and his other companies also hold sizeable ownership shares of the Debtors. *See*
Debtors' Statements of Financial Affairs. Graf also owns approximately 27% of Settle Inn. *See* Feb.
Graf Tr. at p. 23 lines 3 – 12; pp. 27:19 – 28:7. Graf previously owned an interest in Crown and, up until
the Petition Date, had been receiving $2,900 per month from Crown. *See id.* at pp. 49:22 – 50:9.
Following the Petition Date – when Graf could no longer be paid from the Debtors – he then began
receiving $2,900 per month from a Settle Inn hotel in La Crosse, Wisconsin because that hotel's partners,
including Brendan Watters ("Watters"), found another way to get Graf paid and they were, as Graf put it,
"willing to help me out." *See id.* at pp. 50:1 – 51:3; pp. 52:19 – 53:16. Watters is Settle Inn's CEO and
holds ownership interests in Settle Inn and Crown. *See id.* at p. 23 lines 13 – 21; pp. 32:17 – 33:6; *see
also* Twiss Tr. at pp. 17:23 – 18:4.

current franchises should be retained over other options. Best Western, the franchisor for one of

the Debtors, has recently filed a motion requesting that the Debtors assume or reject their

executory franchise agreement because the Amended Plan does not provide for treatment of its

agreement.[17]  Additionally, the Debtors owe more than $108,000 to Settle Inn[18] and they have

failed to indicate how they will pay that amount in order to assume their franchise agreements or

why that would even be a proper exercise of their business judgment. Graf has admitted that he

wants to negotiate Settle Inn's claim, but he has not held any such negotiations.[19]

Another major failing of the Amended Plan is that it lacks a credible exit plan. The

Debtors propose to pay interest payments to Lender on its secured claims until December 2015,

at which point the amounts owed would mature. Under the Debtors' proposal, they would be

required to pay Lender approximately $7,000,000 at the maturity date. The Debtors have not

provided any basis to believe that they will be able to repay the remaining debt to Lender at that

time. *See M & S Assocs., Ltd.*, 138 B.R. 845, 852 (Bankr. W.D. Tex. 1992) (holding that the

plan was not feasible for a debtor whose only assets were apartment buildings because "[e]ven if

the Debtor can utilize net cash flow to stay current on its pay rate under the Notes prior to

maturity . . ., it has no source of funds with which to repay the principal debt at maturity. It is

highly unlikely that the Apartments could be sold or refinanced to repay the entire unpaid

principal balance during or at the end of the Plan. Confirmation of the Plan would merely allow

the Debtor to postpone the inevitable, and to gamble, with the [lender]'s money, on the long shot

possibility of a drastic improvement in the real estate market."); *see also Hoffman*, 52 B.R. at

---

[17] *See* Dkt. No. 121.

[18] *See* Debtors' Schedules.

[19] *See* Aug. Graf Tr. at p. 22 lines 5 – 10.

215 (holding that a plan relying upon the sale of real estate at the end of the 2-year plan term was not feasible because "there is no provision in the [plan] for treatment of the [secured creditor's] claim in the event there is no sale of the real estate. . . . [and] the Court is not satisfied that the proposed sale of the real estate as contemplated is sufficiently concrete to assure either consummation within the two years or that even if sold within the two-year period the price obtained would be sufficient to pay the principal balance and accrued interest owing to [the secured creditor]."). For the past year and a half, the Debtors have been unsuccessful at obtaining any additional financing.[20] Since February 2011, the Debtors have not even attempted to obtain additional financing.[21] The Debtors have not provided any proposals to market and sell the Hotels or obtain refinancing. Nor have the Debtors provided any explanation as to why they expect their previously unsuccessful efforts to obtain financing to bear fruit in the future, especially given the fact that Graf admitted that "financing today is very difficult."[22] Indeed, under financing terms currently available in the market, the Debtors would not be able to obtain sufficient funds to refinance that amount of debt.

Moreover, under the Amended Plan, the Debtors would be required to make both interest *and* principal payments to Lender over the next four years. Since the Petition Date, the Debtors have solely been making interest payments at the 5.91% contract rate for the Loan to Lender on approximately $6,300,000 of principal. The interest payments under the Amended Plan would be made on $7,880,001.83, which is the amount of Lender's secured claim and which amount is more than 20% higher than the amount on which the Debtors have been making cash collateral

---

[20] *See* Feb. Graf Tr. at p. 14 lines 5 – 20; p. 19 lines 1 – 8; p. 93 lines 5 – 9.

[21] *See* Aug. Graf Tr. at p. 7 lines 10 – 15.

[22] *See id.* at p. 6 lines 12 – 13.

interest payments. Additionally, under any confirmable plan, the Debtors are likely to make plan payments at a higher interest rate than the contract rate for the Loan. The Debtors have accepted Lender's March 2011 Appraisals, which state that the market terms for a mortgage loan for their Hotels is 7% interest and a 20-year amortization schedule. Such interest rate is on the low end considering the 100% loan-to-value ratio, the lack of any solvent guarantor and the Debtors' substantial risk of default. Repayment under these terms is equivalent to a yearly debt service for all Hotels of $733,122.84, which is nearly *double* the $349,200.00 in interest that the Debtors have been paying to Lender during the bankruptcy. The Debtors cannot demonstrate how they will satisfy that amount of debt, especially with no new value. The Amended Plan simply is not feasible.

   5.   *Graf's Continued Role With The Debtors Is Not In The Interests of Creditors*

The Amended Plan indicates that the Debtors intend to maintain their current ownership structure, with Graf, the entities that he controls and the Debtors' current equity investors continuing to control the Debtors. However, the continued control by the Debtors' current ownership is not in the interests of their creditors, in violation of 11 U.S.C. § 1129(a)(5)(A)(ii). The Debtors' current ownership presided over the Debtors' economic decline and are either insolvent, such as Graf, or are unwilling or unable to contribute any funds toward a reorganization. Moreover, many of these equity holders owe the Debtors money for loans. The Debtors have not provided any justification as to why their current ownership's continued control is in the interests of the Debtors' creditors. The only parties benefiting from their continued control are Graf, Settle Inn and Crown, who continue to pad their wallets to the detriment to the Debtors' creditors, the largest of which by far is Lender.[23] Indeed, that has been

---

[23] In that regard, the Amended Plan violates 11 U.S.C. § 1129(a)(5)(B) by not revealing the compensation to be received by Graf.

22

the only apparent purpose served by these cases.[24]

6.    *Secured Creditor Cramdown Is Improper*

A debtor may only confirm a plan if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). A plan is "fair and equitable" with respect to secured creditors if they retain their liens on their collateral and receive deferred cash payments with a present value equal to the value of their secured claims. 11 U.S.C. § 1129(b)(2)(A)(i).

The Amended Plan proposes to repay Lender over a period of four years at an annual interest rate of the lesser of 6% or the national prime rate plus 2% (which is currently equivalent to 5.25%), amortized over 30 years. *See* Am. Disclosure Statement at Ex. C, § 5.1.2. Although Nebraska Courts presume that the appropriate interest rate is calculated by adding a 2% risk adjustment factor to the prime rate, a creditor can overcome that presumption. Local R. Bank. P. 3023-1; *Till v. SCS Credit Corp.*, 541 U.S. 465, 479 (2004) (plurality); *In re Schreiner*, No. BK08–41014–TLS, 2009 WL 924418, at *1 (Bankr. D. Neb. Mar. 30, 2009) (J. Saladino). "Factors for a court to consider when deciding whether the formula rate is sufficient include the estate's circumstances, the nature of the security, and the duration and feasibility of the plan," which account for a bankrupt debtor's greater risk of nonpayment as compared with solvent commercial borrowers. *Schreiner*, 2009 WL 924418 at *2. Where the formula rate is lower than the rate that an efficient market can produce, the market rate should be used. *Till*, 541 U.S. 476 n.14; *Gen. Elec. Credit Equities, Inc. v. Brice Road Devs., L.L.C. (In re Brice Road Devs., LLC)*,

---

[24] Crown only manages 11 hotels (10 of which are involved in these bankruptcy cases and the related Case No. 10-82869). *See* Heintz Tr. at p. 7 lines 1 – 5. Heintz admitted that if Crown loses the right to manage the Debtors' hotels, it would "go out of the hotel business." *Id.* That result would harm Graf because his only source of income is the sole non-debtor hotel managed by Crown. *See* Aug. Graf Tr. at pp. 26:25 – 27:10.

60642-0255/LEGAL21603470.4

392 B.R. 274, 279-80 (6th Cir. 2008).

The Debtors' proposed interest rate and amortization and the rate proposed under the
Local Rules are unreasonably low for repayment of Lender's secured claim. Lender's March
2011 Appraisals, which the Debtors have accepted, state that the market terms for the Hotels is a
7% interest rate and a 20-year amortization schedule. The Debtors cannot accept the valuations
in Lender's appraisals and reject the implied loan terms upon which those values are based.
Moreover, the Amended Plan's proposed interest rate is less than the current 5.91% contract rate
on the Loan, which has a 20-year amortization schedule. Graf even admitted that a market rate
of interest for the Loan is 5.5 – 6.5% on a 20-25 year amortization schedule.[25]  Yet he said that
the reason that the Debtors proposed below-market terms for repayment of Lender's Class One
claim was because it was only way that they could make their plan "work financially."[26]  It is
unreasonable for the Debtors to impose a lower interest rate on Lender in violation of *Till*,
especially given that the restructured loan is at a 100% loan-to-value ratio with no solvent
guarantor and substantial risk of default.

Indeed, the risk of default cannot be underestimated. It is undisputed that: (i) the Debtors
were unable to remain current on their Loan at the contract rate on a lower principal balance; (ii)
the Debtors' equity holders are unable or unwilling to contribute any new funds; (iii) the Hotels
need substantial capital improvements; and (iv) the Hotels' post-petition performance has been
unimpressive. Additionally, the Debtors have failed to propose a default interest rate, a solvent
guarantor, additional collateral or any other conditions that would protect Lender should the
Debtors default on their Amended Plan payments. Such terms are especially important to protect

---

[25] *See* Aug. Graf Tr. p. 9 lines 12 – 18.

[26] *See id.* at pp. 45:13 – 46:6.

Lender's secured claims because the guarantor of the Loan, Graf, has admitted that he is insolvent[27] and the Debtors have not proposed any new guarantors that could guaranty the amounts owed to Lender.[28]

### 7.    Unsecured Creditor Cramdown Is Improper

A plan is "fair and equitable" with respect to an unsecured class of creditors if it provides that class with property on the effective date of the plan equal to the allowed amount of their claims, or provides that the holders of claims or interests junior to the claims of that unsecured class will not receive or retain property under the plan on account of their junior claims or interests. 11 U.S.C. § 1129(b)(2)(B). This test, known as the Absolute Priority Rule, has three components: (a) the identification of junior claims or interests; (b) the identification of any property retained by the holders of such claims or interests; and (c) the determination whether the property is retained "on account of" a junior claim or interest. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle Street P'Ship*, 526 U.S. 434, 441-42 (1999); *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1313 (7th Cir. 1995).

The Amended Plan violates the Absolute Priority Rule by allowing the Debtors' current equity holders to retain their equity without first providing for full payment of all unsecured claims. *In re Schriock Constr., Inc.*, 167 B.R. 569, 578 (Bankr. D. N.D. 1994) ("under the 'fair and equitable' requirement, which is defined by the absolute priority rule, equity holders cannot

---

[27] Graf has judgments entered against him personally totaling at least $3.2 million and his wages have been garnished in connection with at least one of those judgments. *See* Feb. Graf Tr. at pp. 52:19 – 54:16. Lender is also presently suing Graf in the United States District Court for the District of Nebraska, Case No. 10-00361, to recover the full amount due under the Loan for breach of his guaranty of the Loan and Lender has moved for summary judgment. Graf has no ability to contribute any new cash to the Debtors. *See id.* at p. 19 lines 1 – 3.

[28] Graf admitted that in today's market, if the Debtors were to seek a refinancing of the Loan, a lender would require a solvent guarantor. *See* Aug. Graf. Tr. at pp. 9:19 – 10:1. He also admitted that he is

25

retain control or an interest in the reorganized debtor unless the rejecting unsecured creditor class

receives the full value of its allowed claim on the effective date of the plan.").[29]

The Amended Plan also violates the exception — or corollary — to the Absolute Priority

Rule known as the New Value Exception. In order for existing equity holders to retain an

interest in a reorganized debtor when a class of unsecured creditors is not being fully

compensated, the equity holders must contribute money or money's worth equivalent to their

participation, which means it must have a place in the asset column of the balance sheet, must be

a present contribution rather than a promise to pay, must be freely tradeable in the market by the

debtor and must be an asset. *203 North LaSalle*, 526 U.S. at 454. "Sweat equity" is not

considered money or money's worth. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 204

(1988). In addition to being in money or money's worth, the contribution must be substantial

and equal or exceed the value of the retained interest in the debtor. *In re Hoffinger Indus., Inc.*,

321 B.R. 498, 510 (Bankr. E.D. Ark. 2005). Graf admitted[30] that the Amended Plan fails to

propose *any* new value contributions by the Debtors' current equity holders, causing the

---

insolvent and that the Debtors do not intend to provide a new solvent guarantor. *See id.* at pp. 22:16 – 23:2.

[29] The Absolute Priority Rule applies to both Lender's Class One and Class Two claims. *See, e.g., Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.)*, 166 B.R. 428, 436 (C.D. Cal. 1993) ("absolute priority is an implicit part of the 'fair and equitable' formula: the dissenting secured creditor must ordinarily be paid in full before any junior class may share under the plan."); *In re Prussia Assocs.*, 322 B.R. 572, 595 (Bankr. E.D. Pa. 2005) ("The concept of fair and equitable involves more than the application of a mechanical calculation of absolute priority . . . When the proposed distribution would substantially shift the risk of failure of the plan from a junior class to a senior dissenting class for no legitimate purpose, the plan is not fair and equitable to the dissenting class.") (quoting *In re Consul Rest. Corp.*, 146 B.R. 979, 989 (Bankr. D. Minn. 1992)); *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 941 (Bank. S.D. Fla. 1992) ("The Third Amended Plan is also not fair and equitable since it provides for the debtor's partners to retain their interests in the debtor while Aetna, as a secured creditor, is not being paid in present value terms, before the partners. The debtor argues that the absolute priority rule [is] available only to unsecured creditors. This Court (as well as several others) disagrees. The absolute priority requirement is implicit in § 1129(b)(1) and (2), imposing a 'fair and equitable' standard on cram down plans."); *In re Elijah*, 41 B.R. 348, 352 (Bankr. W.D. Mo. 1984) (same).
[30] *See* Aug. Graf Tr. at p. 8 lines 6 – 11.

26

Amended Plan to fail the Absolute Priority Rule.

    8.    *The Debtors Cannot Use Lender's Cash Collateral To Pay Any Of The Payments Under The Amended Plan*

The Debtors propose to use Lender's cash collateral to make various payments under their Amended Plan, including paying Lender's Class Two unsecured deficiency claim in full on the effective date and paying their administrative expenses. *See* Am. Disclosure Statement at Ex. C, §§ 4.1, 5.2. The Amended Plan violates Sections 361 and 363(e) of the Bankruptcy Code by proposing to use Lender's cash collateral to fund the Debtors' obligations under their plan without providing Lender with additional adequate protection. Graf admitted that the Debtors have no plans to offer Lender any additional adequate protection.[31] To use Lender's cash collateral to fund their plan, the Debtors must provide Lender with replacement security. *See* 11 U.S.C. §§ 361, 363(e); *see also In re Griswold Building LLC*, 420 B.R. 666, 701 (Bankr. E.D. Mich. 2009) ("The Debtors are not proposing any replacement collateral or other indubitable equivalent for their spending of the $1,588,000.00 of rents and revenues they have collected, but are simply proposing to pay these funds back in a balloon payment, five years from confirmation. The third amended plan does not leave the Lender with adequate protection for its interest in the $1,588,000.00 of rents presently held in the lockbox. Those funds are therefore not available to make the $775,000.00 of cash payments that the third amended plan requires on confirmation. The Debtors' evidence does not show that they have any other source of funds to make the payments required by the third amended plan on confirmation. As a result, the Court finds that the third amended plan is not feasible immediately upon confirmation."). The Debtors have not offered any new value or other new collateral to adequately protect Lender's interest in

---

[31] *See* Aug. Graf Tr. at p. 41 lines 7 – 24.

27

its cash collateral and thus the Debtors cannot use Lender's cash collateral to make their plan

payments.

a.   The Debtors Cannot Use Lender's Cash Collateral To Pay Lender's Class
Two Unsecured Claim

The Debtors propose to eliminate Lender's Class Two unsecured claim by paying it in

full on the effective date with Lender's cash collateral, without also paying all impaired general

unsecured claims at that time.  Although it would be proper for the Debtors to apply some of the

cash collateral to Lender's Class One secured claim, it is improper for them to apply their cash to

Lender's Class Two unsecured claim because it has the effect of making a section 1111(b)

election for Lender.  Section 1111(b)(2) of the Bankruptcy Code establishes a general rule that

an undersecured creditor may elect to have its claim treated as secured to the full extent that the

claim is allowed even though, under section 506(a), it otherwise would be considered secured

only up to the value of the collateral.  If the section 1111(b) election is made, the secured party

forfeits its unsecured claim for a deficiency and loses the opportunity to affect the decision of the

unsecured class to accept or reject the plan.

The Debtors cannot force a section 1111(b) election on Lender because only the secured

creditor can make such an election.  *See* Fed. R. Bankr. P. 3014  ("An election of application of

§ 1111(b)(2) of the Code by a class of secured creditors . . ."); *see also Oxford Life Ins. Co. v.*

*Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.),* 166 B.R. 892, 897 (B.A.P. 9th Cir.

1994) ("the election is to be exercised by the creditor, not the debtor."); *In re Channel Realty*

*Assocs. Ltd. P'Ship,* 142 B.R. 597, 600 (Bankr. D. Mass. 1992) (same); *In re B&B West 164th*

*Street Corp.,* 147 B.R. 832, 838 (Bankr. E.D.N.Y. 1992) ("The law is equally abundantly clear

that such a choice belongs only to the creditor.").

"As the plain words of Section 1111(b) suggest, the choice of whether a secured claim

will be treated as fully secured or split into secured and unsecured components belongs entirely

to the creditor. The choices available to a secured creditor under Section 1111(b) surely include a

statutory option to employ an unsecured deficiency claim to have a significant voice in, and if its

claim is large enough, dominate the unsecured class so that it can avoid the genre of tactical

classification of claim schemes being used [by the debtor] in this case to silence [its secured

lender]." *In re 266 Washington Assocs.*, 141 B.R. 275, 285 (Bankr. E.D.N.Y. 1992).

Accordingly, the Debtors cannot use their cash to pay Lender's Class Two unsecured deficiency

claim.

        b.    <u>The Debtors Cannot Use Lender's Cash Collateral To Pay Administrative</u>
             <u>Claims</u>

        The Debtors propose to use Lender's cash collateral to pay their administrative

expenses.[32] *See* Am. Disclosure Statement at Ex. C, § 4.1. Such a proposal is improper. *In re*

*Buttermilk Towne Center, LLC*, 442 B.R. 558, 566-67 (B.A.P. 6th Cir. 2010) ("'Where there is a

specific assignment of rents given as security, a diversion of any portion of the rents to a party

other than the secured party is clearly a diminution of the secured party's interest in the

assignment of rents portion of the security. The secured party has a security interest in the full

amount of the future rents. *Therefore, this court cannot accept that the use of future rents to*

*replace the expenditure of the prior months rents somehow provides adequate protection for the*

*secured party.*'") (quoting *Travelers Ins. Co. v. River Oaks Ltd. P'Ship (In re River Oaks Ltd.*

*P'Ship)*, 166 B.R. 94, 97-98 (E.D. Mich. 1994)) (emphasis in original). A non-consenting

secured creditor must receive more than a replacement lien on rents that are already encumbered

---

[32] Graf admitted that the Debtors do not have a separate source of funds to pay their attorneys' fees. *See*
Aug. Graf Tr. at pp. 20:24 – 21:6.

by the secured creditor's pre-petition lien for a debtor to be able to utilize the creditor's cash

collateral to pay its administrative expenses. *Id.* Here, Lender has first priority perfected

security interests in the cash proceeds of, and the rents and revenues generated by, the Hotels

pursuant to Lender's separate assignments of leases and rents for each Hotel and pursuant to its

separate deed of trust and/or mortgage for each Hotel. The Debtors do "not indicate that [they]

possess[] any unencumbered assets with which [they] can offer the lender adequate protection."

*Id.* at 566. Nor do they have any new value to be used for such purposes. Thus, they cannot use

their cash to pay their administrative expenses.

9. *The Amended Plan Appears To Propose Impermissible Substantive Consolidation Of The Debtors' Estates*

Although the Debtors never specifically seek substantive consolidation of their estates,

their Amended Plan effectively causes such substantive consolidation. "Substantive

consolidation should be invoked 'sparingly.'" *Reider v. Fed. Deposit Ins. Corp. (In re Reider)*,

31 F.3d 1102, 1109 (11th Cir. 1994); *see also In re Lewellyn*, 26 B.R. 246, 251 (Bank. S.D. Iowa

1982) ("Because the consolidation affects substantive rights . . . and can treat some creditors

unfairly, consolidation must be 'used sparingly.' The courts must carefully scrutinize the

evidence before consolidating the estate even if there is no opposition."). The sole purpose of

substantive consolidation is to promote the fair and equitable distribution of the debtors' assets.

*In re Huntco Inc.*, 302 B.R. 35, 38 (Bankr. E.D. Mo. 2003). "It must be recognized and

affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice

the rights of creditors. This is so because separate debtors will almost always have different

ratios of assets to liabilities. Thus, the creditors of a debtor whose asset-to-liability ratio is higher

than that of its affiliated debtor must lose to the extent that the asset-to-liability ratio of merged

estates will be lower." *Chan v. Austin Bank of Chicago (In re Chan)*, 113 B.R. 427, 429 (Bankr.

30

N.D. Ill. 1990). "[I]t is clear that courts have required that propriety of consolidation be measured against a high burden of proof." *In re Farmers & Feeders, Inc.*, Nos. 93–30770, 93–30818, 1994 WL 1887489 at *5 (Bankr. D. N.D. Jan. 10, 1994).

Factors to be considered when deciding whether substantive consolidation is appropriate include: (a) the necessity of consolidation due to the interrelationship among the debtors; (b) whether the benefits of consolidation outweigh the harm to creditors; and (c) the prejudice resulting from not consolidating. *First Nat'l Bank of El Dorado v. Giller (In re Giller)*, 962 F.2d 796, 798 (8th Cir. 1992). The Debtors have shown no evidence that their businesses require consolidation based on their interrelationships. The Debtors have consistently treated each Hotel as a separate business. The Hotels have separate books and records, ownership structures, vendor contracts, franchise relationships, employees and cash collateral budgets. Also, consolidation has the potential to harm creditors of some of the Debtors. The Debtors owe differing amounts to their unsecured creditors and their franchisors. Pooling all of these creditors together as joint creditors could lead to some creditors profiting off of the combined creditworthiness of the Debtors at the expense of other creditors. The Debtors would not suffer any prejudice if the Court was to deny their request to consolidate other than additional administrative fees in drafting separate plans and disclosure statements.

Graf has also admitted that creditors dealt with each Debtor separately.[33] It is of "great significance" that "the movants in this case have wholly failed to adduce any evidence that any of the creditors treated the separate debtors as a unified entity and relied on the financial strength of both entities in extending credit." *In re Farmers & Feeders*, 1994 WL 1887489 at *6. Substantive consolidation is thus improper.

---

[33] *See* Aug. Graf Tr. at pp. 25:25 – 26:8.

### III.    CONCLUSION

The Debtors have had almost a year to demonstrate that they can reorganize within a reasonable time, but they have failed to do so.  The Debtors should not be permitted to further jeopardize Lender's collateral and remain in bankruptcy for the benefit of their insiders and affiliates when they have no chance of confirming a plan.  Consequently, the Court should grant Lender relief from the automatic stay to permit it to exercise all of its remedies against the Debtors and their assets.

Dated: August 31, 2011

Respectfully submitted,

**U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR-IN-INTEREST TO BANK OF AMERICA, N.A., AS TRUSTEE, SUCCESSOR TO WELLS FARGO BANK, N.A., AS TRUSTEE, FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22**

By:    */s/ David M. Neff*
         One of its Attorneys

David M. Neff, *admitted pro hac vice*
Brian A. Audette, *admitted pro hac vice*
David J. Gold, *admitted pro hac vice*
Perkins Coie LLP
131 S. Dearborn Street, Suite 1700
Chicago, IL 60603
Tel. No. 312-324-8400
Fax No. 312-324-9400

T. Randall Wright (No. 16398)
Baird Holm LLP
1500 Woodmen Tower
1700 Farnam Street
Omaha, NE  68102
Tel. No. 402-636-8228
Fax No. 402-344-0588

60642-0255/LEGAL21603470.4

# Exhibit 1

**United States Bankruptcy Court - District of Nebraska**
**Jointly Administered Case 10-CV-82869**

**Projected Net Operating Income in Debtors' Plan - Motel Pool II**

| | Net Operating Income Projections[a] (1/1/2012 Effective Date) | | | |
|---|---|---|---|---|
| Debtor | 1/2012 - 12/2012 | 1/2013 - 12/2013 | 1/2014 - 12/2014 | 1/2015 - 12/2015 |
| Grand Forks Settle Inn Limited Partnership | $145,130.00 | $165,203.00 | $184,589.00 | $190,203.00 |
| Grand Forks Lodging Limited Partnership | $215,128.00 | $240,210.00 | $265,319.00 | $290,816.00 |
| Kaukauna Lodging, Inc. | $90,000.00 | $110,554.00 | $129,841.00 | $140,685.00 |
| Lincoln Ventures, L.L.C. | $240,300.00 | $265,818.00 | $285,925.00 | $297,970.00 |
| Seward Lodging Builders, Inc. | $105,425.00 | $120,221.00 | $130,063.00 | $134,747.00 |
| Total | $795,983.00 | $902,006.00 | $995,737.00 | $1,054,421.00 |
| Capital expenditure reserve (~4% of gross revenue)[b] | -$159,902.00 | -$165,853.64 | -$170,737.68 | -$174,199.88 |
| Annual plan debt service with 7% interest on a 20-year amortization, as provided in Lender's March 2011 Appraisals[c] | -$733,122.84 | -$733,122.84 | -$733,122.84 | -$733,122.84 |
| Actual Net Operating Income | -$97,041.84 | $3,029.52 | $91,876.48 | $147,098.28 |

[a] Debtor's projected Net Operating Income is taken from Exhibit B to the Debtors' Amended Disclosure Statement.  The calculation of net operating income in the Debtors' Amended Disclosure Statement does not include Class One debt service payments or capital expenditure reserve payments.

[b] The Net Operating Income provided in Exhibit B to the Debtors' Amended Disclosure Statement does not include capital expenditure reserve payments.  This chart reflects a 4% capital expenditure reserve payment using the Debtors' projected revenue.

[c] The annual debt service was calculated using a principal balance equal to the valuations in Lender's March 2011 appraisals plus the Debtors' cash on hand at the Petition Date of October 1, 2010.

# Exhibit 2

**United States Bankruptcy Court - District of Nebraska**
**Jointly Administered Case 10-CV-82869**

**Debtors' Projected Cash on Hand (Excluding Class One Plan Payments and 2012-2015 Capital Expenditure Reserve Payments) - Motel Pool II**

| | |
|---|---:|
| Debtors' projected cash on hand as of Year End 2011 (Cash on hand as of July 31, 2011 ($530,847.89) in addition to the Debtors' projected net income from August - December 2011 ($228,314))[a] | $759,161.89 |
| CWCapital modification fee (1% of Allowed Class One Claim) (paid on Effective Date)[b] | -$78,800.02 |
| Payment of Debtors' attorneys' fees through August 17, 2011 ($205,000 / 2)[c] | -$102,500.00 |
| Payment of General Unsecured Class Three Claims (paid within 1 year of Effective Date)[d] | -$62,942.42 |
| Payment of Lender's Unsecured Class Two Claim (paid on Effective Date)[e] | -$68,399.12 |
| Payment of Best Western Franchise Cure Amount[f] | -$9,784.85 |
| Payment of Settle Inn Franchise Cure Amounts[g] | -$108,335.85 |
| Capital improvements needed at the hotels to comply with franchisor requirements and fix necessary issues[h] | -$380,000.00 |
| Missed monthly capital reserve payments from date of Debtors' last payment (November 2009) through the Effective Date (January 2012) pursuant to Sections 3.6 - 3.10 of the Loan Agreement[i] | -$338,981.94 |
| Cash remaining after Effective Date, necessary capital improvements and payment of all unsecured claims | -$390,582.31 |

[a] As reported in the Debtors' July 2011 Monthly Operating Reports and as projected in their Amended Disclosure Statement, Ex. B.
[b] Amended Disclosure Statement, Ex. C, § 5.1.4.
[c] Amended Disclosure Statement at § 5(G); Ex. C, § 4.1.
[d] Calculated using the Debtors' Schedules of Assets and Liabilities and all filed proofs of claim.
[e] Calculated by subtracting the value of the Debtors' properties (the valuations in Lender's March 2011 appraisals plus the Debtors' cash on hand at the Petition Date of October 1, 2010) from Lender's filed proof of claim.
[f] Taken from the Affidavit of Cheryl Pollack of Best Western International, Inc. at Dkt. No. 151.
[g] Taken from the Debtors' Schedules of Assets and Liabilities
[h] Graf Deposition (February 23, 2011), pages 55:11 - 59:21.
[i] The Loan Agreement provides for 9 monthly payments per year (during the months of March, April, May, June, July, August, September, October and November) of $18,832.33

# Exhibit 3



**The Seasonality of the Debtors' Cash on Hand[1]**
**(Petition Date of October 1, 2010 through April 30, 2011)**

| | Petition Date (October 1, 2010) | April 30, 2011 |
|---|---|---|
| Motel Pool I: Omaha Settle Inn Limited Partnership et al. (10-82870) | $816,692.97 | $484,387.28 |
| Motel Pool II: Kaukauna Lodging, Inc. et al. (10-82869) | $415,001.83 | $327,608.65 |

[1] Calculated using the Debtors' Schedules of Assets and Liabilities and Monthly Operating Reports.

Pool I seasonal loss of cash on hand = $328,265.69
Pool II seasonal loss of cash on hand = $83,413.18
Total seasonal loss of cash on hand = $411,678.87